**UNITED STATES of America, Plaintiff,**

**v.**

**6.50 ACRES OF LAND, Defendant.**

**No. C79–573A.**

United States District Court,
N.D. Ohio, E.D.

Feb. 18, 1986.

Richard J. French, Kathleen Ann Sutula, Asst. U.S. Attys., Cleveland, Ohio, for plaintiff.

Barton J. Craig, Steven S. Kaufman, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

The defendant, Oakhill Properties, a partnership[1] which owned the land and buildings taken by the United States of America in a condemnation action for the Cuyahoga Valley National Recreation Park, seeks an award in the amount of its costs and fees pursuant to the Equal Access to Justice Act, PL No. 96–481 (28 U.S.C. § 2412) plus the attorney's fees and costs required to prosecute the motion for the fees and costs.

### I. APPLICABLE LAW TO THE APPLICATION FOR COSTS AND FEES

Two issues of law have arisen with respect to application for fees and costs in condemnation suits brought by the United States government. First, do the provisions of E.A.J.A. apply to condemnation cases and if so, in what circumstances? Secondly, what standard is to be applied to the issue of whether the position of the United States in the case was one of "substantial justification" as that phrase is used in 28 U.S.C. § 2412(d)(1)(a).

■ The application of the defendants for attorney's fees is brought pursuant to 28 U.S.C. § 2412(d)(1)(a) which provides in relevant part:

Except as otherwise specifically provided by statute, a court shall award to a *prevailing party* other than the United States fees and other expenses, in addition to any cost awarded pursuant to subsection (a), incurred by that party in any civil action, other than cases sounding in tort, brought by or against the United States in any court having jurisdiction of that action, *unless* the court finds that the *position of the United States was substantially justified* or

that special circumstances made an award unjust. (Emphasis added).

After the instant motion was filed, the plaintiff filed a motion for summary judgment asserting that the defendant did not file a timely motion, that the defendant was not a prevailing party and that the statute was superseded by 42 U.S.C. § 4654(a). By an order filed March 5, 1984, the Court ruled for the defendants on the issues raised by the plaintiff, but withheld a determination on the motion for summary judgment until the parties had an opportunity to brief the issue of "substantial justification" as that phrase appears in the provisions of 28 U.S.C. § 2412(d)(1)(a).

In the previous order of March 5, 1984, this Court ruled that in condemnation cases the landowner is "the prevailing party" in the context of 28 U.S.C. § 2412(d)(1)(a) where the award of the jury is substantially in excess of the government's deposit or settlement offer, *citing* as authority *U.S. v. 329.73 Acres*, 704 F.2d 800 (5th Cir.1983) and *U.S. v. 101.80 Acres*, 716 F.2d 714 (9th Cir.1983). As the jury verdict was in excess of either $100,000.00 or $150,000.00 of the government's highest settlement offer[2] and in excess of $200,000.00 of the government's appraisal of the value of the property, this Court has ruled that the defendants are the "prevailing party" as that phrase is used in 28 U.S.C. § 2412(d)(1)(a). Thus, the issue has narrowed to the question of whether the government has been able to meet the burden of showing that its position in this case was one of "substantial justification."

■ The interpretation and application of the phrase "substantial justification" has troubled both district and circuit courts since the enactment of E.A.J.A. Some courts have concluded that the position of the United States as that phrase is contained in 2412(d)(1)(a) refers to the litigation position of the government while other circuits have found that the phrase refers

---

**1.** The Oak Hill properties is a partnership composed of Mr. and Mrs. Leonard Stein-Sapir, the residents of the property.

**2.** *See* footnote 7 *infra.*

to the underlying agency position.[3] In the case at hand, the defendants have argued that they are entitled to fees under either interpretation. Were the underlying agency position to be the interpretation to be followed in evaluating the issue of "substantial justification," then the defendant landowners would be in a position to argue that the park officials managing the Cuyahoga Valley National Recreation Park manipulated the decision to seek a fee interest as opposed to a scenic easement for defendants' property and influenced in a negative fashion the subsequent prosecution of this case in a manner adverse to the interest of the defendants.

However, the recent decision of the United States Court of Appeals for the Sixth Circuit in *Trident Marine Construction, Inc. v. Corp. of Engineers,* 766 F.2d 974 (6th Cir.1985) has resolved for the Sixth Circuit the interpretation to be applied to the phrase "substantial justification" by district courts in evaluating E.A.J.A. applciations for fees. In *Trident,* following an analysis of the two positions, the Court found the rationale supporting the litigation position to be the stronger view and followed the same. Consequently, this Court will apply the government's litigation position in analyzing its opposition to the claim that it should pay the defendants, as the prevailing party, its fees and costs.

## II. HISTORY OF THE CASE

On March 30, 1979, the United States of America filed its complaint seeking, by way of condemnation, on behalf of the Cuyahoga Valley National Recreation Park a fee simple interest in the land of the defendant partnership.[4] The land, 6.50 acres was im-

proved by a renovated 1854 farmhouse with lavish furnishings, a remodeled barn, and other dwellings on the acreage. The defendant property owners filed an answer setting up a number of affirmative defenses directed to the claim that the procedures followed by the government did not conform to law. Additionally, the answer charged the government and its agents with having acted maliciously and in bad faith in designating the property in question for a fee condemnation rather than a scenic easement condemnation.

The case was initially assigned to Judge Leroy J. Contie, Jr., of the United States District Court. Subsequently, in accordance with the protocol establishing new dockets, the case was assigned to Judge Ann Aldrich of the United States District Court in May of 1980. Subsequently the case was again assigned, pursuant to the protocol of establishing new dockets, to this Court on October 16, 1982.

On September 4, 1981, the defendant filed a motion to dismiss which was subsequently overruled by Judge Aldrich. On February 2, 1982, the defendants filed a 77 page motion for summary judgment. On February 16, 1982, the government filed a 23 page competing motion for partial summary judgment directed toward the issue raised in defendants' motion for summary judgment. On February 25, 1982, the defendants filed a 53 page response to the government's motion and again asserted that its motion should be granted. The defendant's motion for summary judgment challenged the government's power to condemn a fee simple interest for the lands in question and claimed a constitutional invasion of privacy. The government's motion

---

**3.** See the erudite opinion setting forth the statutory history of the F.A.J.A. Act, in *Spencer v. National Labor Relations Board,* 712 F.2d 539 (D.C.Cir.1983) and an analysis of the competing interpretations of the phrase "substantial justification."

**4.** In a hearing conducted on December 13–14, 1982, on the issue of the government's right to acquire a fee simple interest, the defendants offered Defendants' Exhibit A (Appendix 1 to this Opinion) which indicates that the govern-

ment's first contact with the defendants by way of a "Letter of Just Compensation" was mailed on January 24, 1978 offering to buy the property at the appraised amount of $185,000.00. The offer was rejected and Mr. and Mrs. Stein-Sapir continued to improve the property which they had acquired several years earlier. By the time of the trial on the issue of just compensation which commenced December 15, 1982, the government had increased its appraisal of the value of the property to the sum of $450,000.00.

was designed to defeat the defenses raised by the defendants to the power to condemn. The competing motions were unresolved when the case was again transferred to this Court in October of 1982. On December 3, 1982, this Court issued an order granting the government partial summary judgment on a number of the affirmative defenses, but reserved a ruling as to the defenses of ill will by the government and the allegation of a violation of the defendants' right of privacy based upon the overriding claim of an arbitrary use of power by the government.[5]

Prior to the commencement of the jury trial on the issue of just compensation, the Court conducted a two day hearing on December 13 and 14, 1982, for 17 hours on the defendants' affirmative defenses of violation of the constitutional right of privacy (Ninth Defense) and bad faith (Eleventh Defense) and found the affirmative defenses to be not well taken and ordered the trial to proceed on the issue of just compensation. The Court also denied the defendants' oral motion for an order permitting the defendants to apply to the Court of Appeals for permission to appeal the interlocutory order regarding the affirmative defenses nine and eleven.

The Court then proceeded with the jury trial on the issue of just compensation on December 15, 1982. Earlier, on December 6, 1982, the government filed a motion in limine seeking an order prohibiting the defendants from presenting testimony of the replacement cost or reproduction cost method of determining the fair market value of the improvements on the subject property. The Court delayed a ruling on the motion until it had the opportunity to conduct a voir dire examination of defendants' expert witness, Chester Giltz, and then overruled the motion by an order published at 2:48 p.m. on December 16, 1982. The Court's ruling was of critical importance to the defendants' presentation on the issue of just compensation. Absent such a ruling, the defendant property owners apparently would have had no compet-

ing expert testimony to offer on the issue of the fair market value of the improvements. The jury trial on the issue of just compensation was lengthy, beginning on December 15 and concluding on December 23, 1982, with a jury verdict for the defendants in the sum of $651,500.00.

The pending motion for attorney fees and costs was filed on March 23, 1983. Preliminary disputes with respect to the fee application were resolved by the Court's Order of May 5, 1984. Thereafter, the parties submitted additional exhibits and briefs in support of their respective positions on the issue of "substantial justification."

## III. ASSESSMENT OF THE PROBATIVE VALUE OF THE GOVERNMENT'S CASE ON THE ISSUE OF JUST COMPENSATION

■ The analysis of the government's litigation position may require an evaluation of the government's position on issues of law or, as in this case, may be limited to a consideration of the government's litigation position on factual disputes. In reality, this case, unlike most condemnation cases, involved a protracted battle over the government's right to take the property. On that issue, the government prevailed. On the factual issue with respect to the amount of just compensation, the defendants prevailed. Judge Edwards, in *Spencer v. N.L.R.B.*, 712 F.2d 539 (D.C.Cir.1983), commented on the trial court's role where the dispute centered on fact as opposed to law.

The second atypical type of finding that commonly appears in EAJA decisions involves evaluations of the probative force of evidence submitted by the government. Frequently, the governing legal principles in a civil suit brought by or against the United States are undisputed, and the controversy revolves around competing characterizations of the underlying facts. When the government loses such a case and the prevailing

5. *See* Appendix 2 which is a copy of the December 3, 1982 order.

party requests attorneys' fees, the trial judge must assess the plausibility of the government's original depiction of the situation that gave rise to the suit. Determinations of this order are difficult to classify. Insofar as they entail judgments concerning whether the government's submissions *would* have been sufficient to satisfy the pertinent legal standard had they not been overborne by the evidence presented by the private litigant, they bear some resemblance to rulings on so-called "mixed questions of law and fact," whose vulnerability to review by appellate courts is extraordinarily confused. On balance, however, we think such judgments are more properly classified as factual findings. They involve the same kind of evaluation of the credibility of witnesses and weighing of evidence entailed by ordinary findings of fact—and at which trial judges are especially experienced and skilled. Moreover, considerations of judicial economy counsel strongly against subjecting such judgments to close scrutiny. Trial judges' explanations in EAJA cases of their assessments of the probative value of the government's submissions frequently are sketchy. If they knew that their determinations were to be examined *de novo*, judges would no longer confine themselves to such vignettes; to assist the reviewers (or to protect their judgments against reversal), they would feel obliged to describe and analyze the government's evidence in much more detail. The net result would be substantial waste of time and judicial resources. In sum, we conclude that, to the extent that trial judges' rulings regarding the strength of positions taken in litigation by the United States are based upon assessments of the probative value of the evidence offered by the government, they should be reversed only if "clearly erroneous."

*Id.* at 564 (footnotes omitted).

In sum, this Court views its responsibility in this case to now be narrowed to assessing the probative value of the government's case on the issue of just compensation.

This condemnation case involving the determination of just compensation for the residential property differed from the traditional condemnation case involving residential property. Here the dispute over market value turned on which method, (market data approach or reproduction cost), was appropriate to determine the fair market value of the property. Normally, a condemnation case involving residential property is primarily a battle involving competing comparable sales testimony. The government's expert witness, William Lemmon, maintained that the market data approach was proper and offered testimony concerning seven properties in the area that he found to be comparable for the purpose of extrapolating a value for the subject property. The defendant's expert witness, Chester Giltz, testified in the voir dire proceeding that he was unable to find what he considered a comparable sale because of the unique nature of defendant's property as it had been renovated and improved by the efforts of the present owners, the Stein-Sapirs. On the basis of that testimony, and over the objection of the government, the Court allowed Giltz to testify before the jury that the only way to reach a fair market value on the property was to use reproduction costs. With the Giltz opinion as the predicate, the defendants then offered testimony of builders on reproduction costs for the improvements in place on defendants' property.

The Court remains of the belief that its decision to permit testimony on a reproduction cost basis was correct. However, to declare, as defendants now contend, that such a ruling permitting the property owner to introduce evidence of reproduction costs equates with the proposition that the government's use of the market data approach was unreasonable or lacked substantial justification, is without merit. The Court permitted the jury to consider alternatively the market data approach and also

the reconstruction cost approach.[6] The fact that the jury inferentially rejected the government's market data approach, does not necessarily mean that the government's litigation position was lacking in "substantial justification."

Secondly, in support of its position that the government's litigation position lacks substantial justification, the defendants contend that Lemmon's testimony regarding the seven comparable properties was so flawed that the government's presentation of Lemmon's testimony should not be regarded as "substantial justification." The Court disagrees. Lemmon is an experienced MAI appraiser. It was apparent that he had devoted a great deal of time to his analysis. His positions on value were well documented. He was a forcible advocate of his position.

 In the Court's view, a decision in this case that the government failed to meet the burden of establishing substantial justification for its position, would require use of a rule of thumb to the effect that a jury verdict on the issue of just compensation which exceeds by approximately 45% the government appraiser's evaluation is, standing alone, a repudiation of the government's litigation position requiring a determination that the position lacked "substantial justification." In the Court's view, such a rule of thumb would be an artificial and inappropriate method of determining whether the government's litigation position was substantially justified. Rather, the Court is of the view, reinforced by Judge Edwards' commentary in *Spencer, supra,* that it is the duty of the trial court to assess the strength of the position taken in the litigation by the United States as an independent courtroom observer using the Court's experience as a trial judge as a guide in the assessment process. Applying

such a standard, the Court finds that the government's litigation position, anchored primarily in the testimony of its appraiser, William Lemmon, was one of "substantial justification."

 The defendants also contend that their efforts to settle the case as the jury trial began in December of 1982 failed because the government refused to negotiate in good faith once it became apparent that the reproduction cost opinion of Giltz would be admitted by the trial court. In support of the motion, defendants have included an affidavit of Stein-Sapir.[7] This condemnation case was unusual in several respects. Unlike most condemnation cases, there was, to the Court's knowledge, absolutely no discussion about settlement until defendants' efforts to negate the government's exercise of its power to condemn failed. That failure was not complete until the evening prior to the commencement of the jury trial. Only then did settlement discussions commence. Under other circumstances, the government's refusal to engage in good faith settlement negotiations in a condemnation proceeding where the property owner is the prevailing party might very well constitute support for a judicial declaration that the government's litigation position lacked "substantial justification." But where the settlement discussions are delayed until the eve of the trial by the property owner's steadfast and continuing opposition to the government's attempted exercise of its eminent domain powers the respective settlement positions of the parties are of limited consequence on the issue of "substantial justification."

The Court viewed the defendants' property in order to assist the Court in evaluating the issue of the Giltz testimony as challenged by the government's in limine motion. The Court agreed with the defendants that they had developed the remodeled

---

6. *See* Appendix 3 for a copy of relevant portions of the Court's written charge given to the jury.

7. The government objects to the Court's consideration of the Stein-Sapir affidavit which is attached as Appendix 3. Additionally, the government through counsel contends that the affidavit is inaccurate in that it is counsel's recollection that the government offered in settlement, not $500,000.00 as claimed by Stein-Sapir, but rather $550,000.00. The Court who participated in the settlement discussions has no independent recollection on the $500,000.00—$550,000.00 dispute but does find that the Stein-Sapir affidavit is otherwise consistent with the Court's recollection.

1854 farmhouse and barn into a beautiful piece of property in a magnificent setting. However, based upon the view which was conducted in detail, the Court formed the opinion that the government's appraisal of $450,000.00 was, if anything, inflated. In sum, the Court finds that the government's settlement posture was, under all the circumstances of this case, eminently reasonable.

## CONCLUSION

Based upon the Court's assessment of the probative value of the government's case and its findings with respect to the government's good faith settlement position under all the circumstances of this case, it is the holding of this Court that the government's litigation position on the issue of just compensation for the defendants' property was one of "substantial justification" in the context of 28 U.S.C. § 2412(d)(1)(a).

The defendants' motion for an award of fees and expenses is denied.

IT IS SO ORDERED.

234

| TRACT NUMBER 119-42 | DATE As noted |
|---|---|
| PROJECT Cuyahoga Valley National Recreation Area | CONTRACT NUMBER |
| APPRAISED VALUE $185,000.00 | ▓▓▓▓▓▓▓▓▓ |

| OWNER'S NAME Oakhill Properties (A Partnership) | Leonard R. Stein-Sapir Lorelei Stein-Sapir |
|---|---|
| OWNER'S ADDRESS Office: 725 St. Clair, N.W., Cleveland, OH 44113 3675 Oakhill Rd., Peninsula, Ohio 44264 | PHONE NO. 216-696-2100 or 216-657-2504 |
| TENANT'S NAME None | |
| TENANT'S ADDRESS N/A | PHONE NO. N/A |
| COUNSEL None | PHONE NO. |

| THOSE PRESENT See Below | Appraised amount — $185,000.00 Fair Market Value Fee Owner's counteroffer — $46,250.00 for scenic easement Government's highest offer — $195,000.00 |
|---|---|

REMARKS

**January 24, 1978** Letter of Just Compensation was mailed landowners in the amount of $185,000.00.

**February 27, 1978** At about 3:30 P. M. after several previous unsuccessful attempts to reach Mr. Stein-Sapir, we made phone contact. I told Mr. Stein-Sapir I would like to make an appointment to discuss the Government's acquisition of the subject tract. Mr. Stein-Sapir stated that he had an appraisal on the property that gave an indication of value so much in excess of our offer that there probably was no point in even talking about the matter. However, he would like to go over our appraisal so I set an appointment for 11:00 A. M. Friday March 3, 1978 at his office in Cleveland. I asked Mr. Stein-Sapir who the other partners making up Oakhill Properties are and he stated it was a partnership made up of just he and his wife Lorelei Stein-Sapir and that the partnership was formed in complieance with Ohio's Uniform Partnership Act. The subject tract is part of a tract that was originally designated as Tract 119-16. Subject was split out of Tract 119-16 and designated Tract 119-37. A revised legal description necessitated a further Tract No. change to Tract 119-42 effective January 11, 1978. A Just Compensation letter based on the information current to Tract 119-37 designation was delivered to owner's agent via certified mail on February 14, 1978. In light of change, I will take a new offer package to Mr. Stein-Sapir on March 3, 1978. (R. H. Westmeyer)

**March 3, 1978** I met this date with Mr. Stein-Sapir at his office in Cleveland and delivered to him a new Just Compensation Offer package. I explained to Mr. Stein-Sapir, who is an attorney, the Government's land acqui procedures, the appraisal method used in arriving at the estimate o fair market value which was the basis for the Government's Just Compensation offer, the rights of retention of improved property for

acquisition

DEFENDANT'S EXHIBIT A

| SALE NUMBER | DATE |
|---|---|
| 119-42 | As noted |

| PROJECT | CONTRACT NUMBER |
|---|---|
| Cuyahoga Valley National Recreation Area | 4 |

| APPRAISED VALUE | |
|---|---|
| $185,000.00 | |

OWNER'S NAME
Oakhill Properties (A Partnership) Leonard R. Stein-Sapir Lorelei Stein-Sapir

| OWNER'S ADDRESS Office: 725 St. Clair, N.W., Cleveland, OH 44113 | PHONE NO. 216-696-2100 or |
|---|---|
| 5675 Oakhill Rd., Peninsula, Ohio 44264 | 216-657-2504 |

TENANT'S NAME
None

| TENANT'S ADDRESS N/A | PHONE NO. N/A |
|---|---|

| COUNSEL None | PHONE NO. |
|---|---|

| THOSE PRESENT See Below | Appraised amount — $185,000.00 · Fair Market Value Fee Owner's counteroffer — $46,250.00 for scenic easement Government's highest offer — $195,000.00 |
|---|---|

REMARKS

March 4, 1978 Cont. use and occupancy as provided in Public Law 93-555, the benefits available pursuant to Public Law 91-646 and the condemnation process. I asked Mr. Stein-Sapir if there were any leases, easements, tenants, rights-of-way or other than those indicated on Schedule B of a Certificate of Title issued by Guardian Title & Guaranty Agency, Inc. on October 12, 1977 and Mr. Stein-Sapir said there were none to the best of his knowledge.

Mr. Stein-Sapir said it is his opinion that Public Law 93-555 gives no authority to the Secretary of the Interior to acquire fee title to his improved tract. He asked what were the possibilities of being offered a scenic easement purchase on his property. He said he would be willing to offer a scenic easement for 25% of fair market value. I told him I could ask the Superintendent for a reconsideration of the interest to be acquired. Mr. Stein-Sapir asked me to do that and contact him again March 15, 1978. (R. H. Westmeyer)

March 13, 1978 Memorandum was sent from Acting Land Acquisition Officer, J. W. Blanton to the Superintendent, Cuyahoga Valley National Recreation Area, requesting consideration of request for change of estate to be acquired from fee simple to scenic easement. (R. H. Westmeyer)

March 15, 1978 Mr. Stein-Sapir called to see if we had heard anything regarding scenic easement. I told him we had sent a memorandum request to the Superintendent's office but would probably be a couple of weeks before we know. (R. H. Westmeyer)

| TRACT NUMBER | DATE |
|---|---|
| 119-42 | As noted |

| PROJECT | CONTRACT NUMBER |
|---|---|
| Cuyahoga Valley National Recreation Area | |

**APPRAISED VALUE**
$185,000.00

**OWNER'S NAME**
Oakhill Properties (A Partnership) Leonard R. Stein-Sapir Lorelei Stein-Sapir

| OWNER'S ADDRESS Office: 725 St. Clair,N.W., Cleveland, OH 4411 3675 Oakhill Rd., Peninsula, Ohio 44264 | PHONE NO. 216-696-2100 or 216-657-2504 |
|---|---|

**TENANT'S NAME**
None

| TENANT'S ADDRESS N/A | PHONE NO. N/A |
|---|---|

| COUNSEL None | PHONE NO. |
|---|---|

**THOSE PRESENT**
See Below

Appraised amount - $185,000.00 Fair Market Value Fee
Owner's counteroffer - $46,250.00 for scenic easement
Government's highest offer - $195,000.00

**REMARKS**

May 8, 1978

June 12, 1978

July 27, 1978 Mr. Stein-Sapir called and I told him the Superintendent denied request to change acquisition to scenic easement. Mr. Stein-Sapir said there was no way he would sell the property. I told him I had no other recourse then but to submit the matter for resolution through eminent domain proceedings. He agreed and said to do what I had to.

This tract is recommended for condemnation based on impasse in negotiatons basically over authority of Government to acquire fee title difference of opinion. (R. H. Westmeyer)

July 31, 1978 Concur - (R. R. O'Donnell)

August 28, 1978 Final (15 day letter) Offer mailed landowners in the amount of $195,000

| Follow-UP | Negotiator (Signature) |
|---|---|
| | R. H. Westmeyer |
| | Supervisor (Signature) |
| | M. J. Sweeney, Land Acquisition Officer |

APPENDIX 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

UNITED STATES OF
AMERICA, Plaintiff,

vs.

6.50 ACRES OF LAND, MORE OR LESS,
SITUATED IN THE COUNTY OF
SUMMIT, STATE OF OHIO, et al.,
Defendants.

CASE NO: C79–573A

Dec. 3, 1982

ORDER

DOWD, J.

This is a land condemnation action brought by the United States of America, through the Secretary of the Interior, to take the fee title to improved property that is to be used in the Cuyahoga Valley National Recreation Area (CVNRA). The CVNRA was established by Public Law 93–555, 16 U.S.C. §§ 460ff, et seq., passed by Congress on December 27, 1974.

Before the Court are the motion for summary judgment filed by the defendant landowner Oakhill Properties and the motion for summary judgment of the plaintiff United States of America.

In the brief in support of its motion, the defendant raises five defenses which were originally incorporated into its answer. A sixth defense, also in the answer, was raised in the defendant's brief in opposition to the government's motion. The six defenses follow:

1. The Government's power to take this land is severely limited by the CVNRA statute (third defense).

2. The Government failed to comply, in a timely or adequate manner, with the statute's planning requirements (fifth and sixth defenses).

3. The Government failed to prepare an Environmental Impact Statement (EIS) as required by 42 U.S.C. § 4332 (eighth defense).

4. The Government's attempt to condemn this property violates the defendant's constitutional right of privacy (ninth defense).

5. The Government has shown ill will and bad faith in attempting to condemn fee title to this property (eleventh defense).

The summary judgment motion of the United States of America impliedly seeks a dismissal of all of the affirmative defenses to the exercise of the power of eminent domain raised by the answer, and a ruling that the trial proceed only as to the issue of just compensation to be paid to the landowners.

For the reasons stated below, the plaintiff is entitled to summary judgment on four of the defenses, and that the other two defenses must await resolution at trial. The Court makes this order so that the issues at trial will be limited.

I.

The property involved in this case is owned by a partnership of Mr. and Mrs. Leonard Stein-Sapier and is used for single-family residence purposes. This use brings the property within the class of "improved property" as that term is defined by 16 U.S.C. § 460ff–1(e).

The defendant contends the government's authority to condemn the fee title to residential improved property is severely limited by the statute as construed against the background of the legislative history of the act creating the CVNRA. This defense has been raised unsuccessfully in two other cases in this district also arising out of the creation of this recreation area: *United States of America v. 7.17 Acres of Land,* C78–972A, and *Cuyahoga Valley Homeowners and Residents Association v. Cecil Andrus,* C78–1377.

The claim of the defendant is that the legislative history of the statute indicates that the government may only institute eminent domain proceedings against a fee title owner when it is shown that the property is

needed for direct park visitor use. However, as both of the other Courts to consider this defense have already pointed out, it is unnecessary to address legislative history in light of the unambiguous grant of power to the Secretary.

16 U.S.C. § 460ff–1(c) states in part: Fee title to such improved properties shall not be ·acquired unless the Secretary finds that such lands are being used, or are threatened with uses, which are detrimental to the purposes of the recreation area, *or unless such acquisition is necessary to fulfill the purposes of Sections 460ff to 460ff–5 of this Title.* (Emphasis added.)

The affidavit of Lewis S. Albert, Superintendent of the CVNRA, states his findings upon which he concluded that the acquisition of the fee title to this parcel of land is necessary to fulfill the purposes of the statute.

The scope of judicial review of the findings of one such as the Secretary's delegate is limited. See *Berman v. Parker*, 348 U.S. 26, 35–36, 75 S.Ct. 98, 103–104, 99 L.Ed. 27. (1954). Since the required findings have been made, and because this record does not warrant judicially altering the Secretary's decision based upon the findings of the Secretary's delegate, the plaintiff is hereby awarded summary judgment on defense number 3.

## II.

The defendant interprets 16 U.S.C. §§ 460ff–2(a) and 460ff–5(b) to require two-stage planning as a prerequisite to condemnation under the statute. These sections, however, which do indeed require the preparation of a land acquisition strategy plan and a Final Management Plan, respectively, are wholly separate from and make no reference to § 460ff–1(c), which grants condemnation power. Moreover, the language of the statute indicates that these plans are intended to serve only as an informational source to Congress. The sections requiring the plans do not compel the Secretary to furnish the plans as a precondition to his exercise of his power of eminent domain.

Therefore, the adequacy or timeliness of these plans does not serve as a basis for a challenge to the Secretary's condemnation decisions. The plaintiff is entitled to summary judgment on the defenses numbers 5 and 6.

## III.

The defendant has also contended that the government has failed to properly comply with the National Environmental Policy Act of 1969 (NEPA).

Pursuant to 42 U.S.C. § 4332(2)(C) all agencies of the federal government are required to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" setting forth "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

Instead of an EIS being filed, a "negative statement," as recognized under NEPA, was published in the Federal Register. The statement provided that the National Park Service had determined that its plan for the CVNRA would not have a significant environmental impact and, therefore, no EIS would be prepared. The National Park Service did, however, make available to the public a 266-page Environmental Assessment which examined the impacts of the recreation area on both the natural and socio-economic environments.

To obtain judicial review of a decision not to file an EIS, a defendant must first allege "facts which, if true, show that the recommended project would materially degrade any aspect of environmental quality." *Save Our Ten Acres v. Kreger*, 472 F.2d

463, 466 (5th Cir.1973). The Sixth Circuit has ruled that a challenging party's allegations must concern primary impact on the physical environment, not only secondary socio-economic impacts, for the provisions of NEPA to apply. *Breckinridge v. Rumsfeld*, 537 F.2d 864 (6th Cir.1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

The impacts advanced by the defendants in its answer and briefs are primarily socio-economic, not environmental. Any assertions of the environmental concerns required by *Breckinridge* are too conclusory to warrant this Court's review of the decision not to file an EIS.

Therefore, the Court grants summary judgment for the plaintiff on defense No. 8.

## IV.

The Court finds the defenses of ill will by the government and violation of defendant's right of privacy to be inter-connected. Both are founded on a claimed arbitrary use of power by the government.

The Court holds that proper consideration of these defenses must be by trial to the Court without a jury. See *United States v. Land*, 24 F.R.D. 368 (N.D.Cal. 1959).

Accordingly, the plaintiff is granted summary judgment on defendant's defenses numbers 3, 5, 6 and 8, and the remaining defenses shall be tried to the Court to determine whether this case should go forward on the issue of compensation for a governmental taking of land.

IT IS SO ORDERED.

## APPENDIX 3

Both sides in this case have offered opinion evidence as showing the value of the property taken herein. You are the sole judges of the credibility of the witnesses who have testified before you, and of the weight to be given the testimony of each.

The jury should take into consideration the opportunities of the several witnesses for seeing and knowing the things to which they testify, their conduct and demeanor while testifying, their interest or lack of interest, if any, in the results of this proceeding, the reasonableness of their testimony, the extent of their investigation to determine the facts, and from all the facts and circumstances consider the weight to be given the testimony of each.

## CAN AWARD ANY AMOUNT

Also, you are not limited to awarding the exact amount of the appraisal opinion of any witness.

You may award any amount you determine is the fair market value of the property. Your award does not have to coincide or be identical to the appraisal opinion of any witness.

Your award can be for any amount you determine to be the fair market value as you find from the evidence.

One of the basic methods in arriving at fair market value referred to by the witnesses is known as market data approach. This approach is the consideration of the sale of the same or similar properties in the vicinity in the open market reasonably near in time to the date of taking. In this case I have permitted testimony of sales of allegedly comparable properties. Generally, a sale in the open market of the property in question reasonably near in time to the date of taking is the best evidence of its fair market value. Sales on the open market of similar or comparable property reasonably near in time to the date of taking are the best evidence of the fair market value of the property being acquired. Of course, there will be differences in the size, shape, location and immediate surroundings of two pieces of property, and perhaps differences in other respects as well; however, to the extent that the other sales are similar or comparable, the price for which one sold on the open market is the best evidence of the fair market value of the property in question. "Similar" does not mean "identical", but having a resemblance. Obviously no two properties are exactly alike in every respect, but this does not prevent their being comparable. The extent of comparability of the other sales and the weight to be given them and the weight to be given the sale of the subject

property at the date of taking, however, are for you to determine.

The Court has permitted testimony as to the reconstruction cost approach relative to the appraisal of the property in question. You may or may not find such evidence helpful in determining just compensation for the premises. However, if you find that a prudent investor would reproduce the improvements that you find to be on the premises at the reproduction cost figures explained by the witnesses, then you may consider the evidence presented with respect to reproduction costs less depreciation as a guide in assisting you at arriving at the fair market value of the property in question.

With respect to the cost approach, the appraiser must determine the cost of reconstruction of the structures as of the day of trial, in other words, duplicating the structures new as of the date of trial. However, that would result in new structures being located on the site. However, as you know, there are not new structures located on the site. Therefore, after an appraiser determines the cost of reproducing new structures on the site, he must then consider what depreciation he must deduct from the cost of the new structures to bring it to its present value as an aid in determining the fair market value of the premises in question.